1  Bassil A. Hamideh (SBN 261233)
2  THE HAMIDEH FIRM, P.C.
   1801 Century Park East, Suite 2400
3  Los Angeles, California 90067
   Telephone:  (310) 556-9687
4  Facsimile:  (310) 733-5699
   Email:      bhamideh@hamidehfirm.com
5

6  Attorneys for Plaintiffs,
   FORREST KOLB
7  JINYONG NA
   LYNE RENEE
8  JONATHAN FRITZ
   APRIL HUTCHINGS
9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12
   FORREST KOLB;                 CASE NO. 2:15-cv-08512-SVW-JPR
13 JINYONG NA;
   LYNE RENEE;
14 JONATHAN FRITZ; and           **OPPOSITION TO DEFENDANTS'**
   APRIL HUTCHINGS,              **MOTION TO DISMISS SECOND**
15                               **AMENDED COMPLAINT**
16      Plaintiffs,
                                 Hearing
17      vs.                      Date:       May 9, 2016
                                 Time:       1:30 p.m.
18 BELLAGIO LLC, a Nevada Limited Courtroom:  6
   Liability Company; MGM
19 RESORTS INTERNATIONAL; and    [Declarations of Bassil A. Hamideh and
   DOES 1-50, inclusive,         Plaintiffs filed concurrently herewith]
20
21      Defendants.              Honorable Judge Stephen V. Wilson

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.   **INTRODUCTION** ..................................................................................1

II.   **RELEVANT FACTS AND PROCEEDINGS** ...............................2

   A.   Defendants retain Plaintiffs' services ............................................2

   B.   Defendants attempt to negotiate additional use of Plaintiffs' images ...........7

   C.   Defendants unlawfully re-new the use of Plaintiffs' images........................8

III.   **PERSONAL JURISDICTION OVER DEFENDANTS IS PROPER.**......10

   A.   Defendants expressly aimed their activities toward California. ...............10

     i.   **Defendants have changed their story.** ................................................10

     ii.   ***Walden*** **does not foreclose exercising jurisdiction over Defendants.** . 12

   B.   Defendants are subject to personal jurisdiction via their agents.................16

     i.   **Mr. Muscionico and Ms. Jones were Defendants' actual agents.**.......17

     ii.   **Mr. Muscionico and Ms. Jones were Defendants' ostensible agents.** 21

     iii.   **Defendants ratified the acts of their agents.**........................................23

   C.   Defendants' interactive websites subject them to personal jurisdiction......24

   D.   Plaintiffs should be permitted to conduct limited jurisdictional discovery. 25

IV.   **CONCLUSION** ...........................................................................25

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Bixby v. KBR, Inc.*,

     603 Fed. App'x 605 (9th Cir. 2015)................................................................ 14

*California Board Sports, Inc. v. Griffin*,

     10CV1849 WQH WVG, 2011 WL 671960 (S.D. Cal. Feb. 14, 2011) ........ 24

*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.*,

     188 Cal.App.4th 401 (2010).................................................................... 18, 23

*College-Source, Inc. v. AcademyOne, Inc.*,

     653 F.3d 1066 (9th Cir. 2011)................................................................. 16, 20

*Cybersell, Inc. v. Cybersell, Inc.*,

     130 F.3d 414 (9th Cir. 1997)........................................................................ 24

*Daimler AG v. Bauman*,

     134 S.Ct. 746 (2014) .................................................................................... 16

*Kaplan v. Coldwell Banker Residential Affiliates, Inc.*,

     59 Cal.App.4th 741 (1997)........................................................................... 21

*Leibman v. Prupes*,

     2015 WL 898454 (C.D. Cal. Mar. 2, 2015) ................................................ 14

*Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co., Inc.*,

     No. CV 15-05024 DDP (EX), 2016 WL 1027998

     (C.D. Cal. Mar. 14, 2016) ...................................................................... 15, 24

*Miller v. Glenn Miller Prods., Inc.*,

     454 F.3d 975 (9th Cir. 2006)........................................................................ 12

*Mireskandari v. Mayne*,

     No. CV123861JGBMRWX, 2016 WL 1165896,

     (C.D. Cal. Mar. 23, 2016) ............................................................................ 14

*Oppenheimer Fund, Inc. v. Sanders*,

     437 U.S. 340, 98 S.Ct. 2380 (1978)............................................................. 25

*Penthouse Int'l, Ltd. v. Barnes*,

    792 F.2d 943 (9th Cir. 1986)..................................................................19-20

*Picot v. Weston*,

    780 F.3d 1206 (9th Cir. 2015)....................................................................14

*Quigley v. Guvera IP Pty Ltd.*,

    No. C 10-03569 CRB, 2010 WL 5300867 (N.D. Cal. 2010)........................24

*Rio Pops. v. Rio Intl Interlink*,

    284 F.3d 1007 (9th Cir. 2002)....................................................................19

*Ripani v. Liberty Loan Corp.*,

    95 Cal.App.3d 603 (1979)...................................................................17, 23

*Stevens v. Roman Catholic Bishop of Fresno*,

    49 Cal.App.3d 877 (1975)...........................................................................18

*Vanciel v. Kumle*,

    26 Cal.2d 732 (1945)..................................................................................23

*Walden v. Fiore*,

    134 S. Ct. 1115 (2014).......................................................10, 12, 13, 15, 24

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,

    704 F.3d 668 (9th Cir. 2012)...............................................................passim

*Woolley v. Embassy Suites, Inc.*,

    227 Cal.App.3d 1520 (1991)......................................................................17

*Yanchor v. Kagan*,

    22 Cal.App.3d 544 (1971).........................................................................21

*Zamani v. Carnes*,

    491 F.3d 990 (9th Cir. 2007)......................................................................10

**Statutes**

California Civil Code § 2295.................................................................................17

California Civil Code § 2297.................................................................................17

California Civil Code § 2298...................................................................................17
California Civil Code § 2299...................................................................................17
California Civil Code § 2300...................................................................................21
California Civil Code § 2300...................................................................................23

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

This case involves a claim by Plaintiffs Forrest Kolb, Jinyong Na, Jonathan Fritz, Lyne Renee, and April Hutchings (collectively "Plaintiffs") alleging that Defendant Bellagio, LLC and its parent company, MGM Resorts International (collectively "Defendants"), improperly used Plaintiffs' images beyond a license period to market Defendants' numerous casinos and resorts.

Defendants previously moved to dismiss this case based on lack of personal jurisdiction and the first-to-file rule because they had improperly filed an anticipatory case in Nevada before Plaintiffs could file this case.  The Court rejected Defendants' first-to-file argument but granted the motion on jurisdiction grounds, giving Plaintiffs leave to amend.  One of the main assertions in Defendants' prior motion was that Defendants played no role in selecting Plaintiffs as the models for the photo shoot at issue; rather, Defendants placed all responsibility on the photographers they hired.

However, Defendants have gotten caught with their hands in the cookie jar. It turns out that Defendants were directly involved in choosing Plaintiffs as the models for the photo shoot, knowing specifically that Plaintiffs were based in Los Angeles.  In fact, Defendants debated whether to utilize models based in Los Angeles or Las Vegas, and Defendants were the ones to choose models from Los Angeles.  Overall, Defendants controlled nearly every single aspect of the photo shoot and should be held responsible in this Court for infringing Plaintiffs' rights.

Therefore, Defendants' motion to dismiss (Doc. 36) lacks all credibility and should be summarily denied for at least the following reasons:

1.  Defendants committed intentional acts expressly aimed at California when they chose Plaintiffs as the models for the photo shoot, lured Plaintiffs to Nevada, coordinated all travel and production arrangements for the photo shoot, and then violated Plaintiffs' rights.

2.  Defendants committed intentional acts expressly aimed at California when

they engaged individuals as their agents and ratified the conduct.

3. Defendants committed intentional acts expressly aimed at California when they used Plaintiffs' images to market all of Defendants' resorts and hotels, including in California, on interactive websites and including **after** Defendants received a letter from Plaintiffs' California counsel.

4. The exercise of jurisdiction is reasonable, not disputed by Defendants.

## II.    RELEVANT FACTS AND PROCEEDINGS

### A. Defendants retain Plaintiffs' services

Bellagio is a world-famous resort hotel and casino located on the Las Vegas Strip whose image as a sophisticated luxury brand is integral to driving its revenue and profits and competing against the multitude of other hotels and casinos in Las Vegas and beyond.  *See* Doc. 34 (Plaintiffs' Second Amended Complaint) at ¶¶ 9, 13.  MGM Resorts International is the ultimate parent of Bellagio, LLC.  *Id*. at ¶ 10. Plaintiffs have been highly successful models and actors who are recognizable because of their appearances in advertising campaigns, television commercials, and high fashion runway shows, all having significant commercial value.  *See id.* at ¶ 8.

In 2009, Defendants sought to change the images they used to promote their world-famous resort hotels and casinos from un-polished, sometimes elderly images, to the images of vibrant professional models.  *See id.* at ¶¶ 13-15.  To further this goal and improve brand image, Defendants hired a production company (B&P Advertising) and others to create a new brand campaign.  *See id.*

Defendants engaged photographer Tomas Muscionico, owner and operator of Tomas Muscionico, Inc. ("Muscionico"), and Gayle Jones (also known as Gayle Kotula), owner and operator of Lift Productions ("Jones"), to hire Plaintiffs through their modeling agency in Los Angeles, California and to take photographs for this new brand campaign.  *See* Doc. 34 at ¶ 15; *see also* Doc. 36-1 (Declaration of April Chaparian), ¶ 4 (now stating that "Bellagio, **or an agent**, contracted with a photography company….") (emphasis added).  Tomas Muscionico and Tomas

Muscionico, Inc. are based in Los Angeles, California.  *Id.*; *see also* Declaration of Michael J. McCue ("McCue Decl.") (Doc. 18-1), Ex. R.[1]  Ms. Jones describes herself as a "production coordinator" who has "impeccable skills" in "coordinating models" and who "books talent" on behalf of companies such as Defendants.  *Id.*

After Defendants engaged Mr. Muscionico and Ms. Jones, the three of them began choosing models for the photo shoot.  The primary contact on behalf of Defendants was Veronica Alvarado, Account Manager at MGM Mirage Marketing & Advertising.  Therein, on November 12, 2009, Mr. Muscionico sent two quotes/budgets to Ms. Alvarado for the photo shoot – one utilizing models from Los Angeles and one utilizing local models (from Las Vegas).  *See* Declaration of Bassil Hamideh filed concurrently herewith ("Hamideh Decl."), Ex. 2 (Muscionico documents) at 3.  Mr. Muscionico highlighted the benefits of greater talent from Los Angeles models versus the cost savings of local models, stating "you get what you pay for."  *See* Hamideh Decl., Ex. 3 (Jones/Kotula documents) at 52-53.[2]

Subsequently, Ms. Jones, on behalf of Defendants, solicited headshots and quotes from Los Angeles modeling agencies and then forwarded links of a variety of Los Angeles models to Ms. Alvarado.  *See, e.g.* Hamideh Decl., Ex. 2 at 4 (email from Mr. Muscionico to Ms. Alvarado stating, "You must have seen Gayle's LA Casting Links – what do you think : KILLER no ???").  For example, Ms. Jones sent an email to an agent at Wilhelmina stating, "I am pulling together a casting for the Bellagio Hotel…We will be creating new photography for the Bellagio Hotels marketing use.  Images will be used in various media to promote gaming and the

---

[1]  Defendants highlight that the invoice from Mr. Muscionico in 2009 lists a Las Vegas address for him, but Defendants conveniently failed to acknowledge that the invoice lists Las Vegas, Los Angeles, and New York as cities for Tomas Muscionico Photography Inc.  *See* Doc. 36-2 at p. 2.

[2]  Mr. Muscionico quoted that local Las Vegas talent would give a "total usage buyout" for the same price as five years of usage for Los Angeles talent.  *See* Hamideh Decl., Ex. 2 at 3; Ex. 3 at 52-53.

3

1   luxury shopping at via Bellagio.  All models should embrace the sophistication and
2   luxury of the five diamond resort."  Hamideh Decl., Ex. 3 at 150; *see also id.* at
3   123-125 (same).  On certain occasions, Defendants specifically instructed Ms.
4   Jones to get additional choices for Los Angeles models.  *See, e.g. id.* at 106 (email
5   from Ms. Jones to Wilhelmina stating, "I am waiting to hear from the client
6   [Defendants] they wanted to see a few more options for the males 40-45 (salt and
7   pepper hair)"); *id.* at 151 ("Gayle, Do you have any more African American and
8   Asian models we can choose from in the 30 -35 year old range? Also, I need more
9   male selections, maybe a couple more female 40 -45 year olds.").

10       Ultimately, Defendants were the ones that decided to use models from Los
11   Angeles.  Hamideh Decl., Ex. 3 at 251; Ex. 2 at 4) (Mr. Muscionico emailing Ms.
12   Alvarado, stating "….and I am very happy that your team [Defendants] decide [sic]
13   to go the LA route, as much I don't wanna compromise in making these shots come
14   to life in postproduction, i.e. Retouching!").  And, ultimately, Defendants made the
15   choice of models (Plaintiffs), and Defendants instructed Mr. Muscionico and Ms.
16   Jones to complete the engagement of Plaintiffs for the Bellagio/MGM photo shoot.
17   Doc. 36-1 (Chaparian Decl.), ¶ 6 (Defendants now acknowledging that after "based
18   on headshots provided by Wilhelmina Models to Mr. Muscionico, MGM or
19   Bellagio identified the models that they were interested"); *see also* Hamideh Decl.,
20   Ex. 3 at 105-108 (Ms. Jones emailing Wilhelmina modeling agency with
21   Defendants' preferred options, stating "I will touch base on Monday after they
22   [Defendants] present these models to the director of marketing"); *see also id.* at
23   123-125 (Ms. Jones emailing Wilhelmina modeling agency, stating "They
24   [Defendants] would like to book [Plaintiff] April Hutchings" and listing the Project
25   Name as "Bellagio Lifestyle Print Ads"); *id.* at 153-154 (Ms. Jones confirming with
26   Wilhelmina the desire to book Plaintiffs, Lyne, Fritz, Jin, and Forrest).

27       Wilhelmina Models, a modeling agency, provided Plaintiffs for the photo
28   shoot.  Doc. 34 at ¶ 17.  The agreement at issue in this case between Plaintiffs and

1   Defendants was negotiated by the agency in Los Angeles, California, and all of

2   Plaintiffs' contacts and negotiations with Defendants regarding the agreement at

3   issue in this case occurred with the agency in Los Angeles, California. *See*

4   Declaration of Jonathan Fritz filed concurrently herewith ("Fritz Decl."), ¶ 5;

5   Declaration of Forrest Kolb filed concurrently herewith ("Kolb Decl."), ¶ 5;

6   Declaration of Jinyong Na filed concurrently herewith ("Na Decl."), ¶ 6.

7          According to Defendants, Mr. Muscionico and Tomas Muscionico, Inc.

8   engaged Ms. Jones, to coordinate the flight and travel arrangements for the

9   Bellagio/MGM photo shoot. Doc. 34 at ¶ 19. Ms. Jones, on behalf of Defendants,

10  communicated with Plaintiffs' agent in Los Angeles to coordinate Plaintiffs' flight

11  and travel arrangements to and from Los Angeles to Las Vegas as well as the

12  logistical arrangements for the photo shoot, including negotiating the terms of

13  Defendants' rights to use Plaintiffs' images in Defendants' advertising and

14  marketing materials. *Id.* In those communications, and at all other times, the photo

15  shoot was referred to as the "Bellagio Lifestyle Shoot." *Id.* Plaintiffs' agent

16  forwarded Ms. Jones' communications to Plaintiffs and aided Plaintiffs in preparing

17  for the photo shoot. *Id.* Plaintiffs were also instructed to keep taxicab receipts for

18  which they would be reimbursed, in addition to a $100 food expense. *Id.*

19         In December 2009, Plaintiffs flew from Los Angeles to Las Vegas for the

20  photo shoot, which took place at the Bellagio hotel and casino. Doc. 34 at ¶ 18;

21  Fritz Decl., ¶ 4; Kolb Decl., ¶ 4; Na Decl., ¶ 4. The photo shoot lasted for one day,

22  and Plaintiffs were provided with rooms at the MGM Grand hotel. *Id.* In fact, it

23  was Ms. Alvarado who booked the rooms for Plaintiffs. *See* Hamideh Decl., Ex. 3

24  at 257 (email from Ms. Alvarado with Subject: Room Reservation Request:

25  Bellagio Lifestyle Shoot, stating "This has been submitted.").

26         On the day of the shoot, Defendants' representatives closed a section of the

27  Bellagio hotel and casino to the public so that Plaintiffs could be photographed for

28  Defendants' photo shoot. Doc. 34 at ¶ 18. Ms. Alvarado controlled the closing of

1   the Bellagio hotel and casino, including Bellagio stores, along with various

2   employees of Defendants. *See, e.g.*, Hamideh Decl., Ex. 3 at 25-26 (Ms. Alvarado

3   emails with other employees of Defendants and getting confirmation that

4   "surveillance" could disable lights and help with craps table).

5       Further, Ms. Alvarado controlled the production of the photo shoot on behalf

6   of Defendants from the beginning.  Among other things, Ms. Alvarado arranged the

7   wardrobes and styling for Plaintiffs, working in conjunction with other employees

8   of Defendants. *See* Hamideh Decl., Ex. 3docs at 8, 62-63; *see also id.* at 25-26

9   (Ms. Alvarado emailing other employees of Defendants asking for wardrobe).  As

10  part of that wardrobe and styling, Plaintiff Na was given a Bellagio uniform and

11  Bellagio nametag.  Na Decl., ¶ 5; Hamideh Decl., Ex. 3 at 66-67 (Ms. Alvarado

12  emailing with the stylist and Ms. Jones regarding Bellagio uniforms, including

13  concierge uniform for Plaintiff Na).

14      Further, Ms. Alvarado, on behalf of Defendants, communicated Defendants'

15  demands for the photo shoot to Mr. Muscionico and Ms. Jones.  For example, on

16  November 12, 2009, Ms. Alvarado told Mr. Muscionico: "There are a total of **5**

17  **images** we [Defendants] will need to shoot.  3 Casino Lifestyle.  1 Retail Lifestyle.

18  1 Concierge Lifestyle."  Hamideh Decl., Ex. 2 at 3.  Ms. Alvarado also coordinated

19  a meeting with Mr. Muscionico and numerous other individuals on December 18,

20  2009 to "take some time to review the photo shoot, take photographs for property

21  sign off and receive Michael Dunn's feedback on the photo shoot direction." *Id.* at

22  5.  And, Ms. Alvarado even sent Ms. Jones a "model release form" and instructed

23  Ms. Jones to send the form to the talent agencies.  Hamideh Decl., Ex. 3 at 35; *see*

24  *also id.* at 65-67 (Ms. Alvarado directing Ms. Jones that the models usage dates

25  were to begin in January 2010 and coordinating photo shoot details); *see also id.* at

26  162-163 (Ms. Alvarado, Mr. Muscionico, and Ms. Jones discussing model release

27  forms); *id.* at 248 (same); Hamideh Decl., Ex. 2 at 7.  Overall, Mr. Muscionico and

28  Ms. Jones controlled and needed approval from Ms. Alvarado, as the voice of

1   Defendants, on nearly every aspect of the photo shoot.  *See, e.g.*, *id.* at 263 (Ms.

2   Jones asking Ms. Alvarado "what types of looks are approved with marketing" and

3   stating that "[w]e need **direction for each shot**") (emphasis added).

4        Defendants directly or indirectly paid Plaintiffs their license fees, a

5   commission to Plaintiffs' Los Angeles modeling agency, and Plaintiffs' airfare,

6   lodging, transportation, and other expenses.  Doc. 34 at ¶ 20.  And Defendants paid

7   B&P Advertising, Mr. Muscionico, and Ms. Jones for their fees.  *Id.*; *see also*

8   Hamideh Decl., Ex. 3 at 13 (Ms. Alvarado advising Mr. Muscionico to send her an

9   invoice for $50,000 because "the big boss asked for this amount").

10       Defendants then used Plaintiffs' images for Defendants' commercial

11  purposes.  Doc. 34 at ¶ 22.  Defendants were the ones who ultimately chose, and

12  had final control and decision making authority over, edited, and approved what

13  images of Plaintiffs to use, or to use Plaintiffs' images at all.  *Id.*  For example, on

14  January 20, 2010, Ms. Alvarado sent an email to Mr. Muscionico and Ms. Jones

15  with the five approved photographs from the final shoot, stating that "[a]ll

16  departments have made their image selections for the Bellagio Lifestyle Photo

17  Shoots."  Hamideh Decl., Ex. 2 at 7.

18            B. <u>Defendants attempt to negotiate additional use of Plaintiffs' images</u>

19       The deal for the original term of use was five years from the original shoot

20  day, wherein all rights Defendants had to use any of Plaintiffs' images and

21  likenesses ended no later than December 21, 2014.  Doc. 34 (Plaintiffs' Second

22  Amended Complaint) at ¶ 11; *see also* Fritz Decl., ¶ 4; Kolb Decl., ¶ 4; Nal Decl., ¶

23  4.  Thereafter, Defendants, through its agents, contacted Plaintiffs' former modeling

24  agency to attempt to re-negotiate additional usage terms.

25       Specifically, at least by April 2015 Defendants knew that their right to use

26  Plaintiffs' images had expired.  Doc. 34 at ¶ 24.[3]  Defendants obtained further

27

28       _____

         [3] On February 5, 2015, B&P Advertising emailed Mr. Muscionico stating

                                           7

rights to the photographs from Mr. Muscionico/Tomas Muscionico, Inc. via a re-license agreement dated April 6, 2015 for "an additional One Year usage" of five photographs, specifying it was for "Photographers – fees ONLY!" *Id.*; Hamideh Decl., Ex. 4 (DEF000018-19). The April 6, 2015 re-license agreement states the address of Mr. Muscionico and Tomas Muscionico, Inc. in Los Angeles. *Id.*[4]

Defendants and/or B&P Advertising engaged Mr. Muscionico and/or Ms. Jones to obtain additional license rights from Plaintiffs for Defendants' continued use of Plaintiffs' images. Doc. 34 at ¶ 23; *see also* Fritz Decl., ¶ 6. Thereafter, Mr. Muscionico and/or Ms. Jones, on behalf of Defendants, contacted the Wilhelmina modeling agency in Los Angeles to attempt to re-negotiate additional usage terms for the use of Plaintiffs' images for a one-year period. *Id.*; *see also* Hamideh Decl., Ex. 3 at 140 (email from B&P that says: "FYI, the client [Defendants] mentioned Gayle contacted them directly to discuss this relicense."); *id.* at 132-134 (Mr. Muscionico and Ms. Jones emailing Wilhelmina; stating that "They [Defendants] just want to keep 4 of the images in the stock library"). Defendants terminated those negotiations because they stated "it would cost too much money," and Defendants never obtained the rights to the re-newed use of Plaintiffs' images. *Id.*

C. <u>Defendants unlawfully re-new the use of Plaintiffs' images</u>

After the expiration of any lawful right to use Plaintiffs' images, Defendants made a conscious, deliberate decision to disregard Plaintiffs' rights and proceeded to continue and re-new the use of all Plaintiffs' images for commercial purposes in

that "Bellagio has some images that have expired or are about to expire." Hamideh Decl., Ex. 3 at 45. The original email came from Ericka Kurtz, Account Manager at MGM Resorts International, asking how much it would cost to re-new the images of Plaintiffs for one additional year. *Id.* Defendants never disclosed Ms. Kurtz as a person with knowledge in their initial disclosures. Hamideh Decl., ¶ 7.

[4] The Court's January 21, 2016 Order states that "there are no allegations or evidence that Defendants reached out to Muscionico in Los Angeles, rather than in Nevada." Doc. 29 at p. 9. However, the April 6, 2015 re-license lists the address for Mr. Muscionico in Los Angeles.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

blatant disregard of Plaintiffs' rights.  Doc. 34 (Plaintiffs' Second Amended Complaint) at ¶ 25.  Such uses of Plaintiffs' images and photographs included prominent uses on many pages throughout Defendants' websites, Defendants' printed brochures, pamphlets, online downloadable brochures, Defendants' Facebook page, uses on Defendants' pages of third-party websites, including without limitation Trip Advisor and Orbitz, and numerous other forms of advertising mediums.  *See id.* at ¶ 29.

On July 22, 2015, counsel for Plaintiffs sent a settlement communication letter to Defendants.  Doc. 34 at ¶ 31.  Thereafter, counsel for the parties agreed to participate in mediation and a mediation was scheduled for October 7, 2015.  *Id.* On September 30, 2015, Defendants' counsel informed Plaintiffs' counsel, and the mediator, that Defendants would not participate in the mediation and that Defendants had filed a declaratory relief action in Nevada.  *Id.*[5]

On October 2, 2015, after both Defendants' Nevada action and this case had been filed, Plaintiff Forrest Kolb and Plaintiffs' counsel again reviewed websites of Defendants' hotels and resorts.  Hamideh Decl., ¶ 4; Kolb Decl., ¶ 6.  On those websites, images of Plaintiffs were still being used by Defendants to market and advertise the hotels and resorts.  *Id.*  For example, images of Plaintiffs Forrest Kolb, Lyne Renee, and Jinyong Na appeared front and center on the "MGM Resorts Vacations" reservations and customer service websites, all of which link directly to each hotel and casino's main website page, in which a user can search for and buy hotel room and flight packages for stays at Defendants' Las Vegas hotels and resorts directly from Los Angeles, California and throughout the rest of the world.

---

[5] Both this Court and the Nevada court have found that Defendants' Nevada action was an improper anticipatory filing.  On March 14, 2016, the parties appeared in Nevada for a Scheduling Conference, and Magistrate Judge Peggy Leen ordered that all discovery in that case be stayed and all discovery should be conducted in California.  Hamideh Decl., ¶ 6.

9

1   *Id.; see also* Hamideh Decl., Ex. 1 (examples from websites for Aria, Bellagio,

2   Circus Circus, Mirage, Vdara, New York New York, Signature at MGM Grand,

3   Mandalay Bay, Excalibur, Luxor hotels/resorts).  Defendants' web pages show

4   bookings generated directly from Los Angeles to Las Vegas for purchase of hotel

5   stay and flights.  *Id.*  In fact, Defendants have continued using Plaintiffs' images

6   into 2016.  *See* Hamideh Decl., Ex. 5 (Defendants' amended interrogatory

7   responses showing Defendants' use of Plaintiffs' images in January 2016).

8   **III.    PERSONAL JURISDICTION OVER DEFENDANTS IS PROPER.**

9           A. Defendants expressly aimed their activities toward California.[6]

10          The Court previously embraced Defendants' reliance on the recent Supreme

11  Court decision, *Walden v. Fiore*, 134 S. Ct. 1115 (2014), in finding that *Walden*

12  foreclosed the reasoning in *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704

13  F.3d 668, 674 (9th Cir. 2012).  However, the Court should review, and reverse, that

14  analysis given the new facts and evidence showing that Defendants were the ones

15  that intentionally chose Plaintiffs as models from Los Angeles.

16          **i.    Defendants have changed their story.**

17          In their initial motion to dismiss, one of Defendants' main factual assertions

18  was the declaration of April Chaparian, the Director of Intellectual Property at

19  MGM.  Ms. Chaparian declared, under oath, that Defendants played no role in

20  selecting Plaintiffs as the models for the photo shoot at issue; rather, Defendants

21  placed all responsibility on the photographers they allegedly contracted with for the

22  photo shoot (Mr. Muscionico and Ms. Jones).  *See* Doc. 18-2 (Chaparian Decl.) at ¶

23

24  _____

25          [6] Because the Court previously focused on the issue of the "expressly aimed"
    issue, and Defendants do not address any other issue in their current motion,
26  Plaintiffs will not discuss the other elements of personal jurisdiction.  Accordingly,
    Defendants should be precluded from raising these issues in their reply.  *See*
27  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (stating that "district court
    need not consider arguments raised for the first time in a reply brief").
28

6 ("Upon information and belief, neither MGM nor Bellagio selected the modeling agency or the models, or had any contracted or other business dealings with the models.").[7]  The Court relied on this assertion in granting Defendants' motion, specifically noting that "Chaparian states that Defendants did not select the modeling agency or the models…."  Doc. 29 (January 21, 2016 Order) at p. 9.

However, Defendants have (rightfully) changed their story.  Now, Defendants assert that after "additional information obtained through investigation, based on headshots provided by Wilhelmina Models to Mr. Muscionico, MGM or Bellagio identified the models that they were interested."  Doc. 36-1 (Chaparian Decl.), ¶ 6.  The troubling aspect of Defendants' change in argument is that their new position is premised on emails that involved one of their employees and was therefore available to Defendants all along.  Even more troubling is the fact that Defendants were able to, and did, receive the documents from Mr. Muscionico or Ms. Jones without serving a subpoena, making it obvious that these documents were obtainable by, and in the possession, custody, or control of, Defendants.[8]  Apparently, Defendants did no real due diligence before filing their initial motion to dismiss (such as requesting documents from Mr. Muscionico or Ms. Jones or searching their own email systems) or before filing their anticipatory lawsuit in

---

[7]  Ms. Chaparian also previously declared that Defendants had no knowledge of the residency of Plaintiffs until after this dispute arose in 2015.  *See* Doc. 18-2 (Chaparian Decl.) at ¶ 6 (stating "neither MGM nor Bellagio … had knowledge of the residence of any of the Kolb Parties, until after this dispute arose with the Kolb Parties in 2015").  No such statement appears in Ms. Chaparian's current declaration because it was clearly false.

[8]  Defendants assert that they obtained the documents at some undisclosed time conveniently after Defendants filed their initial motion to dismiss.  See Doc. 36-1 (Chaparian Decl.), ¶ 5 ("Based on documents we have obtained from the photographer since the Defendants filed their Motion to Dismiss the First Amended Complaint…").

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   Nevada.[9]

2      Having realized that they got caught with their hands in the cookie jar, and

3   that Plaintiffs would unveil their lie, Defendants had no choice to admit that they

4   chose Plaintiffs.  Such admission alone warrants denial of Defendants' motion, but

5   the reality is that Defendants' admission greatly shows their role in the photo shoot

6   and use of Mr. Muscionico and Ms. Jones as their agents.

7          ii.   *Walden* **does not foreclose exercising jurisdiction over Defendants.**

8      In *Walden*, Nevada residents brought an action in Nevada against a DEA

9   agent for alleged Fourth Amendment violations that occurred while the plaintiffs

10  "unilaterally" decided to visit Georgia.  *Walden* itself contrasted its facts with

11  *Calder*, which involved a claim for libel against out of state defendants.  134 S. Ct.

12  at 1124.  *Walden* reasoned that, unlike a Fourth Amendment violation, the

13  reputation-based "effects" of the libel in *Calder* connected the defendants to

14  California, not just to the plaintiff.  *Id.* at 1124-25.  The "crux of *Calder*," according

15  to *Walden*, was that the reputational injury caused by the defendants would not

16  have occurred but for the fact that the defendants wrote an article for publication

17  nationwide, including for purchase and reading by California citizens.  *Id.*[10]

18      Therefore, the application of *Calder*, still valid after *Walden*, justifies the

19  exercise of jurisdiction in this case notwithstanding *Washington Shoe*.  Here,

20  Defendants debated whether to hire models from Los Angeles or Las Vegas.

21  Defendants made the deliberate decision to hire models from Los Angeles.  Then,

22  Defendants reviewed numerous models from Los Angeles and made the deliberate

23

24      [9]  It is not surprising that Defendants did no due diligence before filing their

25  anticipatory lawsuit in Nevada given that they unilaterally terminated the
    mediation, decided to file the lawsuit, drafted the complaint, and filed within hours.

26      [10] Again, rights of publicity, i.e., the rights to a person's name and image, are

27  inherently personal.  *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988, n.6
    (9th Cir. 2006) ("The right of publicity is the inherent right of every human being to

28  control the commercial use of his or her identity").

decision to use Plaintiffs, knowing they were Los Angeles residents.  Then, Defendants engaged their agents to secure the services of Plaintiffs to travel to Las Vegas from Los Angeles for the sole purpose of engaging in the photo shoot for Defendants' benefit.[11]  And, ultimately, Defendants chose the photographs of Plaintiffs to use and renewed that use after Defendants knew the rights had expired.

But for Defendants' desire to revamp its marketing and advertising campaign, and but for Defendants paying for Plaintiffs' rights and providing transportation and housing from Los Angeles to Las Vegas and back, Plaintiffs would have never participated in the photo shoot.  Plaintiffs did not "unilaterally" decide to visit Las Vegas for the photo shoot.  Further, but for Defendants' use of Plaintiffs' images beyond the license period on a number of Defendants' websites worldwide, which directly and actively target California, Plaintiffs would not have suffered damages.  Lastly, Defendants would never have had a right to use Plaintiffs' images unless they obtained some license from Plaintiffs, i.e. a license of Plaintiffs' rights above and beyond any rights the photographer gave Defendants.[12]

Overall, Defendants' continued infringement after the expiration of its rights to use Plaintiffs' images, including after receiving notice of its infringement, is sufficient "individualized targeting" to satisfy the "express aiming requirement."

---

[11]  It is irrelevant that Defendants may not have "directly" contacted Plaintiffs.  *See Walden*, 134 S. Ct. at 1123 ("To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties.").  Regardless, as shown below, Mr. Muscionico and Ms. Jones clearly qualify as Defendants' agents.  *See id.* at 1122 (stating that "although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact").

[12]  Defendants still avoid asserting exactly what their position is.  Defendants assert that "the models directly licensed their rights to the photographer."  Doc. 36-1 (Chaparian Decl.), ¶ 8.  But, Defendants never explain how they had the right to use Plaintiffs' images if they never received a license from Plaintiffs.

1    Again, Defendants engaged with a California photographer to obtain additional

2    rights to use Plaintiffs' images after Defendants' rights had expired.  Then,

3    Defendants received a letter from Plaintiffs' California counsel notifying them of

4    the infringement under California law and causing harm to Plaintiffs in California

5    (though Defendants already knew that at that point).  Lastly, even after receiving

6    the letter from Plaintiffs' counsel, Defendants used Plaintiffs' images, without a

7    license, to advertise all of Defendants' properties worldwide, even after this lawsuit

8    was filed.  *See* Hamideh Decl., Ex. 5 (Defendants' amended interrogatory responses

9    showing Defendants' use of Plaintiffs' images in January 2016).

10         The Court previously cited to Ninth Circuit opinions applying *Walden* in

11   finding that the express aiming prong was not satisfied.  Those cases are

12   distinguishable.  In *Picot v. Weston*, 780 F.3d 1206 (9th Cir. 2015), the defendant's

13   allegedly tortious conduct consisted of making statements to an Ohio resident that

14   caused a Delaware corporation with offices in Ohio to cease making payments to

15   two trust accounts located in Wyoming and Australia.  The defendant "did all this

16   from his residence in Michigan, without entering California, contacting any person

17   in California, or otherwise reaching out to California." *Id.* at 1215. The Ninth

18   Circuit explained that "none of [defendant's] challenged conduct had anything to do

19   with [California] itself." *Id.* (quoting *Walden*, 134 S. Ct. at 1125).[13]

20         On the other hand, as this Court noted, other judges (including in this Court)

21   have found that *Walden* did not foreclose the exercise of personal jurisdiction or the

22   reasoning of *Washington Shoe.  See, e.g., Leibman v. Prupes*, 2015 WL 898454

23   (C.D. Cal. Mar. 2, 2015) (Snyder, J.); *see also Mireskandari v. Mayne*, No.

24   CV123861JGBMRWX, 2016 WL 1165896, at *7 (C.D. Cal. Mar. 23, 2016)

25   (Bernal, J.) (finding jurisdiction proper where defendant placed two phone calls to

26

27   ───────────────

28         [13] *Bixby v. KBR, Inc.*, 603 Fed. App'x 605 (9th Cir. 2015) provides very little, unhelpful analysis and cannot be seen as analogous.

California and knew that plaintiff resided in California).  Further, a recent case in this Court, analogous to the facts of this case, found that the exercise of jurisdiction was proper.  *Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co., Inc.*, No. CV 15-05024 DDP (EX), 2016 WL 1027998 (C.D. Cal. Mar. 14, 2016) (Pregerson, J.).[14]

There, the Court found the exercise of personal jurisdiction proper because the defendant knew it was using the plaintiff's intellectual property to create an advertisement campaign.  *Id.* at \*9 ("Here, but for Havas New York's nationwide advertisement campaign allegedly using Plaintiff's protected intellectual property, Plaintiff would not have been harmed in its home forum, California. Thus, the contacts Havas New York has with the forum—the advertisement campaign using Plaintiff's intellectual property—are also the conduct that gave rise to the suit.").  Further, the Court found that "Havas New York also knew that the ad would be in one of the largest bases of population—and relevant consumer population—in the nation for a nationwide advertising campaign: California." *Id.* at \*8.

Here, there is more than just Defendants' knowledge of Plaintiffs' California residency when Defendants' used Plaintiffs' images without the rights.  Defendants intentionally chose to get better models from Los Angeles and used those models to create an advertising campaign featuring the models that would obviously be used in Defendants' huge customer base of California.  And, again, unlike *Walden*, where the defendants did nothing to create the plaintiffs' appearance in Georgia, Defendants were responsible for Plaintiffs leaving California and being in Nevada (and ultimately paid for that travel).  Defendants' contacts with California can, therefore, not be deemed "random, fortuitous, or attenuated" or based on the "unilateral activity" of Plaintiffs.  *See Walden*, 134 S. Ct. at 1123.

---

[14]  *Lions Gate* is also procedural similar to the extent the parties there attempted to settle the dispute prior to litigation, and the defendants filed an anticipatory declaratory relief action in New York that was subsequently transferred to this Court. *Id.* at \*2.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Therefore, Defendants are subject to personal jurisdiction here.  Intent is a key aspect of the express aiming analysis, and Defendants' intent is highlighted by its deliberate choice to use Los Angeles models and then renew the use of Plaintiffs' images when Defendants knew the rights had expired (and obviously knew that such harm would be felt in California).  Defendants reached into California to bring Plaintiffs to Nevada, which definitely tethers Defendants' later infringing conduct to California.  To find otherwise would create a bad, slippery slope precedent.  If a defendant can intentionally bring individuals to the defendant's forum (with full knowledge of the individuals' home location), intentionally harm them, and then require that those victims return to the scene of the crime to bring a claim, most plaintiffs will be unable to pursue litigation.  Those defendants will essentially be rewarded for playing "catch me if you can."

Overall, this is more than a prima facie showing of conduct expressly aimed at the forum.  If anything, the facts here support jurisdiction even more than they did in *Calder* because Defendants cannot be characterized as merely an out-of-state defendant with no contacts with California.  Defendants have a subsidiary in California that has an office in California specifically for marketing and operates under the name "MGM Resorts International."  Doc. 36-1 (Chaparian Decl.), ¶ 2.  Defendants' marketing and advertising is at the very heart of this case.

B. Defendants are subject to personal jurisdiction via their agents.

"Minimum contacts" of a nonresident employer's agents or employees ordinarily are imputed to the employer, such as contracts negotiated or torts committed by agents may subject a nonresident employer to local jurisdiction. *College-Source, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1078 (9th Cir. 2011) (holding acts of Chinese contractor employed by defendant to download California company's Web site materials attributed for jurisdiction purposes); *see also Daimler AG v. Bauman*, 134 S.Ct. 746, 759, fn. 13 (2014) ("Agency relationships … may be relevant to the existence of *specific* jurisdiction") (emphasis in original)).

"An agent is one who represents another, called the principal, in dealings with third persons."  Cal. Civ. Code § 2295.  "An agency is either actual or ostensible."  Cal. Civ. Code § 2298.  "An agent for a particular act or transaction is called a special agent.  All others are general agents." Cal. Civ. Code § 2297.

The chief characteristic of the agent is as a representative who has the authority to act for and in the place of the principal for the purpose of bringing the principal into legal relations with third parties.  *See generally Woolley v. Embassy Suites, Inc.*, 227 Cal.App.3d 1520 (1991).  "In order to establish actual or ostensible authority of an agent, the principal's consent need not be express, but may be implied from the facts of a particular case."  *Ripani v. Liberty Loan Corp.*, 95 Cal.App.3d 603, 611 (1979).

Defendants continue their attempt to avoid responsibility by claiming they had no "direct contact" with Plaintiffs.  Defendants again argue that the photographer and Ms. Jones were the only ones who interacted with Plaintiffs (and Plaintiffs' agents) and Defendants seemingly had no responsibility for the photo shoot.  Defendants' position fails to consider that Tomas Muscionico or Gayle Jones clearly were empowered and acted as Defendants' agents.[15]

### i.    Mr. Muscionico and Ms. Jones were Defendants' actual agents.

First, the facts and evidence demonstrate that Mr. Muscionico and Ms. Jones were the actual agents of Defendants.  Actual agency arises "when the agent is really employed by the principal."  Cal. Civ. Code § 2299.

As shown above, Defendants' employee, Ms. Alvarado clearly controlled nearly every aspect of the photo shoot.  Ms. Alvarado instructed Mr. Muscionico on exactly the number and type of photographs that Defendants demanded.  Ms.

---

[15] Further, it appears that Defendants are at least conceding that B&P Advertising was their agent.  *See* Doc. 36-1 (Chaparian Decl.), ¶ 4 (now stating that "Bellagio, or an agent, contracted with a photography company….").

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1  Alvarado reviewed all of the proposed models and informed Mr. Muscionico and

2  Ms. Jones of Defendants' choice of Plaintiffs, and then Ms. Alvarado directed Mr.

3  Mr. Muscionico and Ms. Jones to finalize the engagement of Plaintiffs for the

4  photoshoot.  *See, e.g., Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.*, 188

5  Cal.App.4th 401, 426 (2010) (finding sufficient evidence of agency when broker

6  had authority to bind principal to agreements with third parties).

7  Before the photo shoot, Ms. Alvarado arranged the wardrobe, styling, and

8  security for the photo shoot, taking the necessary steps for parts of the Bellagio

9  hotel and casino be closed off to the public just for the photo shoot.  After the photo

10  shoot, Ms. Alvarado advised of Defendants' choices for the specific photographs of

11  Plaintiffs that would be used by Defendants and coordinated with Mr. Muscionico

12  for the final touch-ups of those photographs.  Finally, Ms. Alvarado arranged for

13  the payments to Plaintiffs, Mr. Muscionico, and Ms. Jones, and Defendants

14  ultimately used the photographs in their marketing and advertising.

15  Overall, Defendants controlled every aspect of the photo shoot and use of

16  Plaintiffs' images.  Defendants made all of the final decisions.  Mr. Muscionico and

17  Ms. Jones were mere puppets, with Defendants (through Ms. Alvarado) pulling the

18  strings.[16]  Therefore, the acts of Mr. Muscionico and Ms. Jones related to California

19  – namely, obtaining model portfolios from various agencies in Los Angeles,

20  negotiating with Plaintiffs' agents, and engaging Plaintiffs to travel to Las Vegas

21

22  [16] The most telling may be Ms. Jones, herself, acknowledging that the photo
shoot was being conducted under Defendants' complete direction.  *See, e.g.,*
23  Hamideh Decl., Ex. 3 at 263 (Ms. Jones asking Ms. Alvarado "what types of looks
24  are approved with marketing" and stating that "[w]e need direction for each shot").
Notwithstanding, Defendants cannot dispute that they had the right to control Mr.
25  Muscionico and Ms. Jones and could have terminated them at any time, which
26  establishes an agency relationship even if Defendants exercised any control.  *See*
*Stevens v. Roman Catholic Bishop of Fresno*, 49 Cal.App.3d 877, 884 (1975) ("It is
27  not essential that the right of control be exercised or that there be actual supervision
28  of the work of the agent; the existence of the right establishes the relationship.").

18

1  from Los Angeles – are imputed to Defendants and create sufficient contacts with

2  California to exercise personal jurisdiction over Defendants.

3      Defendants cite a number of cases in their motion to dismiss for general

4  agency propositions, most notably that engaging Mr. Muscionico and Ms. Jones

5  and paying them did not create any agency.[17]  Defendants' arguments and cases are

6  inapplicable given the substantial evidence submitted with this opposition that was

7  not known to Plaintiffs when they filed their Second Amended Complaint.[18]

8      Further, Defendants' attempt to distinguish *Penthouse Int'l, Ltd. v. Barnes*,

9  792 F.2d 943 (9th Cir. 1986) only adds credence to Plaintiffs' agency argument.

10  There, the Ninth Circuit relied upon the proposition that "[o]ne who contracts to act

11  on behalf of another and subject to the others' control except with respect to his

12  physical conduct is an agent and also an independent contractor."  *Id.* at 947 (citing

13  *City of Los Angeles v. Meyers Brothers Parking System, Inc.*, 54 Cal.App.3d 135,

14  138 (1975) and Restatement (Second) of Agency § 14N (1958)).

15      In finding that the district court did not err in characterizing the photographer

16  as an agent, the Ninth Circuit recognized the district court's explanation:

17      [t]he acts performed by Dunas may be distinguished by the separate

18      roles that he performed as a free-lance photographer and as an

19      authorized Penthouse agent. The latter role is similar to activities

20

21      _____

      [17]  Defendants improperly attempt to impose a higher standard on Plaintiffs at
22  this procedural juncture, basically wanting the Court to decide conclusively whether
   an agency relationship existed.  Plaintiffs' must make only "a *prima facie* showing
23  of jurisdiction to avoid the defendant's motion to dismiss."  *Rio Pops. v. Rio Intl
   Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002).

24      [18]  Defendants' argue in their motion that "Plaintiffs do not allege that
25  MGM or Bellagio controlled the specifics and daily operations of Mr.
   Muscionico's photography company such as what modeling agency to use or the
26  conduct of the photo shoot, when the photo shoot started, who performed make up
   and lighting, how the models were arranged in each shoot."  Doc. 36 at p. 13.  Well,
27  Plaintiffs could not have alleged the conduct of Ms. Alvarado and Defendants
28  because Defendants concealed this information and documents.

19

performed by a salesman, i.e., soliciting young women to pose for Penthouse and convincing them to sign a Penthouse release form.... Dunas was an agent for Penthouse for the purpose of securing model releases. He was also an independent contractor as a Penthouse photographer. *Id.*

The exact same can be said here of Mr. Muscionico and Ms. Jones. Even if their conduct in taking the photographs can be categorized as that of an independent contractor, their conduct in soliciting Plaintiffs to conduct the photo shoot and thereafter engaging Plaintiffs and securing Plaintiffs' rights evidences them as agents of Defendants. That is especially true considering Ms. Alvarado sent Ms. Jones a "model release form" and instructed Ms. Jones to send the form to the talent agencies. Hamideh Decl., Ex. 3 at 35; *see also id.* at pp. 65-67 (Ms. Alvarado directing Ms. Jones that the models usage dates were to begin in January 2010 and coordinating photo shoot details); *see also id.* at 162-163 (Ms. Alvarado, Mr. Muscionico, and Ms. Jones discussing model release forms); *id.* at 248 (same); *see Penthouse*, 792 F.2d at 947 (acknowledging that "Penthouse … gave him blank Penthouse contracts … and had him present contracts to models").

And, it was the conduct of Mr. Muscionico and Ms. Jones in soliciting Plaintiffs and securing Plaintiffs' rights that involved the California contacts. Defendants would never have gotten Plaintiffs to participate in the photo shoot had Mr. Muscionico and Ms. Jones not contacted Plaintiffs' talent agent (located in Los Angeles), negotiated with the talent agent, and secured the services of Plaintiffs (residents of Los Angeles). In the end, Plaintiffs have submitted sufficient evidence that directly contradicts Defendants' argument and demonstrates agency. *See CollegeSource, Inc.*, 653 F.3d at 1078 ("In the circumstances of this case, we attribute no jurisdictional significance to the fact that employees of AcademyOne's contractor performed the relevant work on AcademyOne's behalf. AcademyOne hired the contractor and gave it specific instructions on how to collect course catalogs and descriptions from schools' websites.") (citations omitted)).

     **ii.**    **Mr. Muscionico and Ms. Jones were Defendants' ostensible agents.**

Second, these actions clearly show Defendants enlisting Mr. Muscionico and Ms. Jones to deal with Plaintiffs and Plaintiffs' talent agency and empowering Mr. Muscionico and Ms. Jones as Defendants' ostensible agents. "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." Cal. Civil Code § 2300. There are three requirements necessary to hold a principal liable for the act of an ostensible agent: (1) the person dealing with the agent must do so with a reasonable belief in the agent's authority; (2) such belief must be generated by some act or neglect of the principal; (3) and the third person must not be guilty of negligence. *Kaplan v. Coldwell Banker Residential Affiliates, Inc.*, 59 Cal.App.4th 741, 747 (1997). Whether ostensible agency exists "... is a question of fact ... and may be implied from circumstances." *Yanchor v. Kagan*, 22 Cal.App.3d 544, 550 (1971) (citation omitted).[19]

Here, Plaintiffs reasonably believed that Mr. Muscionico and Ms. Jones were acting as Defendants' agents. Doc. 34 at ¶ 21. The communications from Mr. Muscionico and Ms. Jones to Plaintiffs and Plaintiffs' talent agent evidence the ostensible authority: "I am pulling together a casting for the Bellagio Hotel…We will be creating new photography for the Bellagio Hotels marketing use. Images will be used in various media to promote gaming and the luxury shopping at via Bellagio. All models should embrace the sophistication and luxury of the five diamond resort." Hamideh Decl., Ex. 3 at 123-125, 150.

Further, it is more than reasonable that Plaintiffs would believe that they were dealing with agents of Defendants because of the production of the photo

---

[19] Defendants' motion to dismiss completely fails to address ostensible agency aside from the bare recital of the two types of agency. Accordingly, Defendants should be precluded from address ostensible agency in their reply.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1  shoot.  Amongst other things, parts of the Bellagio hotel and casino were blocked

2  off for the photo shoot, and Plaintiffs were given rooms at an MGM property.  If

3  Mr. Muscionico and Ms. Jones did not have the authority from Defendants, how

4  could all of that be accomplished?

5       Second, the acts of Defendants, opposed to simply Mr. Muscionico or Ms.

6  Jones, caused Plaintiffs to believe the agency relationship.  The choice of models

7  (Plaintiffs) was made by Defendants, and that decision was communicated to

8  Plaintiffs' talent agency.  *See* Hamideh Decl., Ex. 3 at 105-108 (Ms. Jones emailing

9  the Wilhelmina modeling agency with Defendants' preferred options for models,

10  stating "I will touch base on Monday after they [Defendants] present these models

11  to the director of marketing"); *see also id.* at 123-125 (Ms. Jones emailing

12  Wilhelmina modeling agency, stating "They [Defendants] would like to book

13  [Plaintiff] April Hutchings" and listing the Project Name as "Bellagio Lifestyle

14  Print Ads"); *id.* at 153-154 (Ms. Jones confirming with Wilhelmina the desire to

15  book Plaintiffs, Lyne, Fritz, Jin, and Forrest).

16       Further, the acts of Defendants, including without limitation those of Ms.

17  Alvarado, during the photo shoot evidenced the agency relationship.  In addition to

18  closing off the casino and shops for the shoot, Defendants provided Plaintiffs with

19  styling and direction and a Bellagio uniform and Bellagio nametag.  Again, if Mr.

20  Muscionico and Ms. Jones did not have the authority from Defendants, how could

21  all of that be accomplished?

22       Here, it is undisputed that Mr. Muscionico and Ms. Jones communicated with

23  Plaintiffs and Plaintiffs' agents (and ultimately retained the services of Plaintiffs)

24  and represented that they were conducting the photo shoot on behalf of Defendants

25  and that Plaintiffs' images would be used for Defendants' advertising and

26  marketing campaign.  Defendants knew of these communications because Ms.

27  Alvarado and other employees of Defendants were intimately involved in the

28  development and production of the photo shoot.  If Mr. Muscionico and Ms. Jones

had no authority when Plaintiffs were being photographed inside the (closed to the public) Bellagio with a Bellagio uniform and Bellagio personnel present, why did someone from Defendants not say something? [20]

### iii.   Defendants ratified the acts of their agents.

"An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification."  Cal. Civil Code § 2307.

Here, Defendants clearly ratified the conduct of Mr. Muscionico and Ms. Jones.  Defendants were the ones that decided to use models from Los Angeles and that chose Plaintiffs as the models to use for the photo shoot.  Defendants were the ones that chose the photographs of Plaintiffs that Defendants would ultimately use for their advertising and marketing.  And, Defendants were the ones that paid Mr. Muscionico and Ms. Jones and directly or indirectly paid Plaintiffs.[21]

Further, Defendants cannot dispute that they knowingly used Plaintiffs' images to market and advertise Defendants' properties, to Defendants' benefit. That use, without a license or consent, imposes liability on Defendants and clearly evidences ratification.  *See Ripani*, 95 Cal. App. 3d at 613 (holding that defendant's continued occupation of the premises, with knowledge that agent had executed the exercise of option and with the knowledge that tenant did not desire a month-to-month tenancy and was relying upon the exercise of the option constitutes a ratification of the acts of agent); *Vanciel v. Kumle*, 26 Cal.2d 732, 735 (1945) (holding bank ratified agents' conduct when it accepted and retained benefit of agents' act and made payments to plaintiffs).

---

[20] At a minimum, Mr. Muscionico's and Ms. Jones's ostensible authority was evidenced by Defendants' silence.  Where a principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct may give rise to liability under a theory of ostensible authority. *See Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.*, 188 Cal.App.4th at 426-27.

[21]  It appears that Defendants directly paid Plaintiffs' modeling agency – the invoice of Mr. Muscionico states: "Talent Fees Billed Direct."  Doc. 36-2 at p. 3.

23

C. <u>Defendants' interactive websites subject them to personal jurisdiction.</u>

When personal jurisdiction is premised on a defendant's internet activity, courts must examine "the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997) (quotation omitted); *see Quigley v. Guvera IP Pty Ltd.*, No. C 10-03569 CRB, 2010 WL 5300867 (N.D. Cal. 2010) (analyzing a website that falls somewhere between passive and interactive,); *see also California Board Sports, Inc. v. Griffin*, 10CV1849 WQH WVG, 2011 WL 671960 (S.D. Cal. Feb. 14, 2011) (finding that defendant "directed business activities at consumers in California by selling products on [its] website," "advertis[ing] extensively over the internet," and corresponding with plaintiff (sending a cease and desist letter) in California).[22]

Defendants' websites using Plaintiffs' images obviously target consumers outside of Nevada, including California, because the websites focus on allowing consumers to buy hotel room and flight packages (including with Defendants' partner travel websites like Orbitz).  Obviously, Defendants' advertising using Plaintiffs' images is not targeting local residents to fly down the street.[23]

Defendants argue that the Court already considered, and rejected, this

_____

[22] *Walden* specifically left open the "very different questions whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State" because *Walden* dealt with the seizure of physical assets.  *Walden*, 134 S. Ct. at 1125 n. 9.

[23] Contrary to Defendants' conclusory assertions, it is irrelevant that their internet advertising campaign spread nationwide, especially considering Defendants chose the prominent Los Angeles modeling industry.  *See Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co., Inc.*, 2016 WL 1027998 at *8 ("The alleged harm was felt nationwide, consistent with the extent of the campaign, but the harm was also targeted toward California specifically as a major hub of the TD Defendants' business, the location of Plaintiff's principal place of business, and the heart of the entertainment industry.").

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

argument.  However, the Court should reconsider, and reverse, the analysis based on the entirety of Defendants' websites, which was cut off from the prior exhibits submitted to the Court.  After the Court issued its January 21, 2016 Order, in which the Court did not believe Defendants' websites amounted to interactive websites, Plaintiffs' counsel realized that the exhibits submitted in opposition to Defendants' initial motion to dismiss cut off certain portions of the website.  Hamideh Decl., ¶ 5. Notably, Plaintiffs' previous submission cut off the portions of the websites that allowed consumers to purchase flights and hotel accommodations from Defendants' websites.  *Id.*  Plaintiffs have corrected the exhibits with this opposition.  *Id.*

      D. <u>Plaintiffs should be permitted to conduct limited jurisdictional discovery.</u>

"[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n. 13, 98 S.Ct. 2380, 2389 n. 13 (1978).  Here, further discovery will likely demonstrate further facts sufficient to constitute a basis for jurisdiction. More specifically, Plaintiffs propose the following discovery: Deposition of Ms. Alvarado; Deposition of B&P Advertising; Deposition of Mr. Muscionico; Deposition of Ms. Jones; Deposition of Defendants.  These depositions will elicit further jurisdictional information related to the engagement of Mr. Muscionico and Ms. Jones and the authority given to them by Defendants.  Further, Plaintiffs should be able to obtain discovery from Defendants regarding their sales and marketing to California residents.  Plaintiffs served written discovery on this, but Defendants have refused to respond, citing the Court's prior denial of jurisdictional discovery.

## IV.   CONCLUSION

For the forgoing reasons, Defendants' motion to dismiss should be denied.

DATED: April 18, 2016

                                 **THE HAMIDEH FIRM, P.C.**

                    By   /s/ Bassil A. Hamideh

                                 Bassil A. Hamideh
                                 Attorneys for all Plaintiffs